UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : | Master File No. 12-md-02311 |
| | : | 12-cv-00203-MOB-MKM |
| PRODUCT(S): | : | THIRD CONSOLIDATED AMENDED |
| | : | CLASS ACTION COMPLAINT |
| INSTRUMENT PANEL CLUSTERS | : | |
| | : | |
| This Document Relates to: | : | JURY TRIAL DEMANDED |
| | : | |
| ALL END-PAYOR ACTIONS | : | |
| | : | |

Plaintiffs Halley Ascher, Gregory Asken, Kimberly Bennett, Tenisha Burgos, Rita Cornish, Lori Curtis, Theresia Dillard, Jane Fitzgerald, Carroll Gibbs, Dori Gilels, Gary Arthur Herr, Elizabeth Kaufman, Kelly Klosterman, Rebecca Lynn Morrow, Sophie O'Keefe-Zelman, Roger Olson, Whitney Porter, Erica Shoaf, Arthur Stukey, Keith Uehara, Phillip Young, Tom Halverson, Melissa Barron, John Hollingsworth, Meetesh Shah, Jane Taylor, Jennifer Chase, Darrel Senior, James Marean, Ron Blau, Darcy Sherman, Curtis Gunnerson, David Bernstein, Robert Klingler, Jessica DeCastro, Nathan Croom, Edward Muscara, Michael Wick, Ian Groves, Jason Grala, Kathleen Tawney, Curtis Harr, Cindy Prince, Frances Gammell-Roach, Andrew Hedlund, William Dale Picotte, Alena Farrell, Janne Rice, Robert Rice, Stacey Nickell, and Carol Ann Kashishian (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to them and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection laws and unjust enrichment.

Plaintiffs demand a trial by jury, and allege as follows:

## NATURE OF ACTION

This lawsuit is brought as a proposed class action against Defendants DENSO Corporation and DENSO International America, Inc. (together, "DENSO Defendants" or "DENSO"); Continental Automotive Electronics Llc, Continental Automotive Korea Ltd. and Continental Automotive Systems, Inc. (collectively, "Continental Defendants" or "Continental") (Continental Defendants collectively with DENSO Defendants, "Defendants"), Co-conspirators Yazaki Corporation and Yazaki North America, Inc. (together, "Yazaki Co-

1

conspirators" or "Yazaki"), Nippon Seiki Co., Ltd., N.S. International, Ltd. and New Sabina

Industries, Inc. (collectively, "Nippon Seiki Co-conspirators" or "Nippon Seiki"),[1] and unnamed

co-conspirators, manufacturers, and/or suppliers of Instrument Panel Clusters (defined below)

globally and in the United States, for engaging in a nearly eight-year-long conspiracy to

unlawfully fix, artificially raise, maintain, and/or stabilize prices, rig bids for, and allocate the

market and customers in the United States for Instrument Panel Clusters (defined below).

"Instrument Panel Clusters," also known as meters, are the mounted array of instruments

and gauges housed in front of the driver of an automobile.

1. Plaintiffs seek to represent all persons and entities who, during the period from

and including January 2001 through such time as the anticompetitive effects of the Defendants'

conduct ceased (the "Class Period"), purchased or leased a new vehicle in the United States not

for resale which included one or more Instrument Panel Cluster(s) as a component part, or

indirectly purchased one or more Instrument Panel Cluster(s) as a replacement part, which were

manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or

any co-conspirator of the Defendants.

2. The Defendants manufacture, market, and/or sell Instrument Panel Clusters

throughout and into the United States. Defendants and their co-conspirators (as yet unknown)

agreed, combined, and conspired to fix, raise, maintain, and/or stabilize prices, and allocate the

market and customers in the United States for Instrument Panel Clusters.

3. The U.S. Department of Justice's ("DOJ") antitrust Division is currently

conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the

---

[1] Plaintiffs previously named Yazaki and Nippon Seiki as Defendants in this action. Plaintiffs subsequently entered into settlements with Yazaki and Nippon Seiki, which was finally approved by the Court on June 20, 2016. *See*, *e.g.*, Opinion and Order Granting Final Approval of Class Action Settlement, Case No. 2:12-cv-00203, ECF No. 184. For purposes of this Third Consolidated Amended Class Action Complaint, Yazaki and Nippon Seiki are referred to as Co-Conspirators instead of Defendants.

automotive parts industry.  As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry.  The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and its impact on American consumers and businesses.  The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded $2.4 billion in criminal fines to date.

4.      As hereafter more fully alleged, Yazaki Corporation agreed to plead guilty and pay a criminal fine of $470 million – the second largest fine ever for an antitrust violation – stemming from its participation in three separate unlawful conspiracies to fix prices of certain auto parts, including fixing prices for Instrument Panel Clusters from at least as early as December 2002 and continuing until at least February 2010.  Nippon Seiki Co., Ltd. agreed to plead guilty and pay a criminal fine of $1 million stemming from its participation in a conspiracy to fix prices of Instrument Panel Clusters from at least as early as April 2008 and continuing until at least February 2010.  In December 2013, it was reported that the South Korea's Fair Trade Commission ("KFTC") had fined DENSO Corp., and one of its Korean subsidiaries, and Continental Automotive Electronics for fixing prices for Instrument Panel Clusters from January 2008 to March 2012.

5.      As part of their plea agreements, Yazaki and Nippon Seiki have agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.

6.      The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing

to rig bids for, and to fix, stabilize and maintain the prices of Instrument Panel Clusters sold to automobile manufacturers and others in the United States. The combination and conspiracy engaged in by the Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection and unjust enrichment laws.

7.      By way of example, representatives from Defendant DENSO discussed with representatives from Defendant Continental and Co-conspirators Yazaki and Nippon Seiki the prices each would bid for contracts to supply Instrument Panel Clusters to various motor vehicle manufacturers.

8.      During these conversations, DENSO entered into agreements with each of Yazaki, Nippon Seiki and Continental to "respect" their core customers, i.e., to refrain from taking their business. In return, Yazaki, Nippon Seiki and Continental pledged to "respect" DENSO's core customers.

9.      As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Classes (as defined below) paid artificially inflated prices for Instrument Panel Clusters during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

10.      Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection and unjust enrichment laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violation of

those state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26); Section 1 of the Sherman Act (15 U.S.C. § 1); and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that:  (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

12.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

13.     This Court has *in personam* jurisdiction over each Defendant because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Instrument Panel Clusters throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and

intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

14.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable, and intended anticompetitive effects upon interstate commerce within the United States.

15.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

16.     Instrument Panel Clusters manufactured abroad by Defendants and sold for use in automobiles that were either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Instrument Panel Clusters are purchased in the United States, and such Instrument Panel Clusters do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial, and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce  described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in  the United States.

17.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in a conspiracy affecting all

states to fix, stabilize, and maintain prices in the United States for Instrument Panel Clusters, which conspiracy unreasonably restrained trade and adversely affected the market for Instrument Panel Clusters.

18.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Instrument Panel Clusters for personal use, including Plaintiffs and members of the Classes.

## PARTIES

### Plaintiffs

19.     Plaintiff Halley Ascher is a District of Columbia resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

20.     Plaintiff Gregory Asken is a Nevada resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

21.     Plaintiff Kimberly Bennett is an Arkansas resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

22.     Plaintiff Tenisha Burgos is a New York resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

23.     Plaintiff Rita Cornish is a Utah resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

24.     Plaintiff Lori Curtis is a Montana resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

25.     Plaintiff Theresia Dillard is a Mississippi resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

26.     Plaintiff Jane Fitzgerald is a Vermont resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

27.     Plaintiff Carroll Gibbs is a District of Columbia resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

28.     Plaintiff Dori Gilels is a Montana resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

29.     Plaintiff Gary Arthur Herr is a Florida resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

30.     Plaintiff Elizabeth Kaufman is a Florida resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

31.     Plaintiff Kelly Klosterman is a North Dakota resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

32.     Plaintiff Rebecca Lynn Morrow is an Arizona resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

33.     Plaintiff Sophie O'Keefe-Zelman is an Arizona resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

34.     Plaintiff Roger Olson is a Michigan resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

35.     Plaintiff Whitney Porter is a District of Columbia resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

36.     Plaintiff Erica Shoaf is an Arizona resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

37.     Plaintiff Arthur Stukey is a Vermont resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

38.     Plaintiff Keith Uehara is a Hawaii resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

39.     Plaintiff Phillip Young is a Tennessee resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

40.     Plaintiff Tom Halverson is an Arizona resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

41.     Plaintiff Melissa Barron is a California resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

42.     Plaintiff John Hollingsworth is a California resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

43.     Plaintiff Meetesh Shah is a California resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

44.     Plaintiff Jane Taylor is a Hawaii resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

45.     Plaintiff Jennifer Chase is an Iowa resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

46.     Plaintiff Darrel Senior is a Kansas resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

47.     Plaintiff James Marean is a Maine resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

48.     Plaintiff Ron Blau is a Massachusetts resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

49.     Plaintiff Darcy Sherman is a Minnesota resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

50.     Plaintiff Curtis Gunnerson is a Minnesota resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

51.     Plaintiff David Bernstein is Minnesota resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

52.     Plaintiff Robert Klingler is a Missouri resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

53.     Plaintiff Jessica DeCastro is a Missouri resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

54.     Plaintiff Nathan Croom is a Nebraska resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

55.     Plaintiff Edward Muscara is New Hampshire resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

56.     Plaintiff Michael Wick is a New Mexico resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

57.     Plaintiff Ian Groves is a New Mexico resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

58.     Plaintiff Jason Grala is a New York resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

59.     Plaintiff Kathleen Tawney is a North Carolina resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

60.     Plaintiff Curtis Harr is a North Dakota resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

61.     Plaintiff Cindy Prince is a Hawaii resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s) while a resident of Oregon.

62.     Plaintiff Frances Gammell-Roach is a Rhode Island resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

63.     Plaintiff Andrew Hedlund is a South Carolina resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

64.     Plaintiff William Dale Picotte is a Washington resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s) while a resident of South Dakota.

65.     Plaintiff Alena Farell is a Vermont resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

66.     Plaintiff Janne Rice is a West Virginia resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

67.     Plaintiff Robert Rice is a West Virginia resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

68.     Plaintiff Stacey Nickell is a West Virginia resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

69.     Plaintiff Carol Ann Kashishian is a Wisconsin resident who purchased at least one Instrument Panel Cluster indirectly from at least one Defendant or its co-conspirator(s).

## Defendants

## DENSO DEFENDANTS

70.     Defendant DENSO Corporation is a Japanese corporation with its principal place of business in Kariya, Japan.  Defendant DENSO Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Instrument Panel Clusters that were purchased throughout the United States, including in this District, during the Class Period.

71.     Defendant DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation.  Defendant DENSO International America, Inc. manufactured, marketed, and/or sold Instrument Panel Clusters that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

## CONTINENTAL DEFENDANTS

72.     Defendant Continental Automotive Electronics Llc is a Korean company with its principal place of business in Bugang-myeon, South Korea.  Continental Automotive Electronics Llc – directly and/or through its affiliates, which it wholly owned and/or controlled – manufactured, marketed and/or sold Instrument Panel Clusters that were purchased throughout the United States, including in this District, during the Class Period.

73.     Defendant Continental Automotive Korea Ltd. is a Korean company with its principal place of business in Seongnam-si, South Korea.  It is an affiliate of and wholly controlled by Continental Automotive Electronics Llc.  Continental Automotive Korea Ltd. – directly and/or through its affiliates, which it wholly owned and/or controlled – manufactured,

marketed and/or sold Instrument Panel Clusters that were purchased throughout the United States, including in this District, during the Class Period.

74.     Defendant Continental Automotive Systems, Inc. is a Delaware company with its principal place of business in Auburn Hills, Michigan. It is an affiliate of and wholly controlled by Continental Automotive Electronics Llc. Continental Automotive Systems, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Instrument Panel Clusters that were purchased throughout the United States, including in this District, during the Class Period.

### Co-Conspirators

75.     Co-conspirator Yazaki Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Co-conspirator Yazaki Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Instrument Panel Clusters that were purchased throughout the United States, including in this District, during the Class Period.

76.     Co-conspirator Yazaki North America, Inc. is an Illinois corporation with its principal place of business in Canton Township, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Yazaki Corporation. Defendant Co-conspirator Yazaki North America, Inc. manufactured, marketed, and/or sold Instrument Panel Clusters that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

77.     Co-conspirator Nippon Seiki Co., Ltd. is a Japanese corporation with its principal place of business in Nagaoka, Japan. Co-conspirator Nippon Seiki Co., Ltd. – directly and/or

through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Instrument Panel Clusters that were purchased throughout the United States, including in this District, during the Class Period.

78.     Co-conspirator N.S. International, Ltd. is a California corporation with its principal place of business in Troy, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Nippon Seiki Co., Ltd. Co-conspirator N.S. International, Ltd. manufactured, marketed, and/or sold Instrument Panel Clusters that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

## AGENTS AND CO-CONSPIRATORS

79.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged.

80.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

81.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL
## ALLEGATIONS

### A.    The Instrument Panel Cluster Industry

82.    Instrument Panel Clusters, also known as meters, are the mounted array of instruments and gauges housed in front of the driver of an automobile.  See Figures 1 and 2.

 

**Figures 1 and 2.  Yazaki Instrument Panel Clusters**

83.    Instrument Panel Clusters are installed by automobile original equipment manufacturers ("OEMs") in new vehicles as part of the automotive manufacturing process.  They are also installed in vehicles to replace worn out, defective, or damaged Instrument Panel Clusters.

84.    For new cars, OEMs – mostly large automotive manufacturers – purchase Instrument Panel Clusters directly from Defendants.

85.    When purchasing Instrument Panel Clusters, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers.  Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years.  Typically, the bidding process begins approximately three years prior to the start of production of a new model.  Japanese OEMs procure parts for U.S.-

manufactured vehicles both in Japan and the United States. Similarly, Korean OEMs procure parts for U.S.-manufactured vehicles both in Korea and in the United States.

86.     Defendants and their co-conspirators supplied Instrument Panel Clusters to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Instrument Panel Clusters (a) in the United States for installation in vehicles manufactured and sold in the United States; (b) in Japan and elsewhere for export to the United States and installation in vehicles manufactured and sold in the United States; and (c) in Japan and elsewhere for installation in vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

87.     Plaintiffs and members of the proposed Classes purchased Instrument Panel Clusters indirectly from Defendants and/or their co-conspirators. By way of example, an owner or leasee of a vehicle may indirectly purchase an Instrument Panel Cluster from Defendants or their co-conspirators as part of purchasing or leasing a new vehicle. An owner or leasee of a vehicle may also indirectly purchase a replacement Instrument Panel Cluster from Defendants when repairing a damaged vehicle or where the Instrument Panel Cluster is defective.

88.     DENSO is the world's largest supplier of Instrument Panel Clusters, having supplied Instrument Panel Clusters to approximately 200 million vehicles since 1951.

89.     For the fiscal year ending 2011, Nippon Seiki realized approximately $1.48 billion in global sales of Instrument Panel Clusters.

90.     Yazaki ranks among the largest worldwide automotive suppliers, ranked 13th by the industry journal Automotive News in 2011. As an OEM supplier, Yazaki interacts directly with car makers such as GM, Ford, Toyota, Jaguar Land Rover, Nissan, Honda, and others. In

2010, Yazaki's total global OEM automotive parts sales were estimated to be approximately $12.5 billion.

**B.** **The Structure and Characteristics of the Instrument Panel Clusters Market Render the Conspiracy More Plausible**

91.     The structure and other characteristics of the Instrument Panel Clusters market in the United States are conducive to a price-fixing agreement, and have made collusion  particularly attractive in this market.  Specifically, the Instrument Panel Clusters market: (1) has  high barriers to entry; and (2) has inelasticity of demand.

**1.      The Instrument Panel Clusters Market has High Barriers to Entry**

92.     A collusive arrangement that raises product prices above competitive levels  would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are  less likely to enter the market.  Thus, barriers to entry help to facilitate the formation and  maintenance of a cartel.

93.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Instrument Panel Clusters market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long- standing customer relationships.

94.     Additionally, DENSO and Yazaki own a number of patents for component parts  of Instrument Panel Clusters.  In fact, Yazaki ranks among the top 100 companies receiving the  most U.S. patents.  These patents place a significant and costly burden on potential new entrants,  who must avoid infringing on the patents when entering the market with a new product.

**2.      There is Inelasticity of Demand for Instrument Panel Clusters**

95.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

96.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

97.     Demand for Instrument Panel Clusters is highly inelastic because there are no close substitutes for these products.  In addition, customers must purchase Instrument Panel Clusters as an essential part of their vehicles, even if the prices are kept at a supra-competitive level.

**C.     Government Investigations**

98.     A globally coordinated antitrust investigation is taking place in the United States, Europe, Japan, and Korea aimed at suppliers of automotive parts, including Instrument Panel Clusters.  A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that the international automotive parts supplier would continue to widen because the automotive industry as a whole comprises many sub-industries.  He characterized the investigations being conducted by international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

99.     The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC").  One carmaker is said to have

failed to attract competitive bids for automotive wire harness systems, leading the company to join with other carmakers to take their complaint to the EC.

100.    On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts, including Instrument Panel Clusters.  The EC also carried out additional raids at the European offices of several suppliers of automotive parts on June 7, 2010.  Specifically, EC investigators raided the offices of Leoni, S-Y Systems, and Yazaki.  "The Commission has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices," an EC official said in a statement.

101.    In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of Furukawa, Sumitomo, and Yazaki as part of an expansive investigation into collusion in the industry dating back to at least 2003.

102.    The DOJ stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe.  "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

103.    Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.  The FBI executed warrants and searched the offices of these companies, including Yazaki's subsidiary in Canton Township, Michigan.  Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

104.     To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate.  That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

**D.      Yazaki Pleads Guilty to Price-Fixing Instrument Panel Clusters**

105.     Co-conspirator Yazaki Corporation agreed to plead guilty to a three-count criminal information and pay a $470 criminal fine for:

(a)      participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to certain automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1;

(b)      participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Instrument Panel Clusters sold to certain automobile manufacturers in the United States and elsewhere from at least as early as December 2002 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; and

    (c)  participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to fix, stabilize, and maintain the prices of fuel senders sold to an automobile manufacturer in the United States and elsewhere from at least as early as March 2004 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

    106.  According to the Information filed, Yazaki Corporation and its co-conspirators carried out the Instrument Panel Clusters conspiracy by:

    (a)  participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

    (b)  agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

    (c)  agreeing, during those meetings, conversations, and communications, to allocate the supply of Instrument Panel Clusters sold to certain automobile manufacturers in the United States and elsewhere on a model-by-model basis;

    (d)  agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile manufacturers in the United States and elsewhere;

    (e)  submitting bids, price quotations, and price adjustments to certain automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling Instrument Panel Clusters to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for Instrument Panel Clusters sold to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)     employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

107.    On August 16, 2012, the DOJ announced that Toshio Sudo, an executive of Co-conspirator Yazaki Corporation, agreed to serve fourteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of Instrument Panel Clusters sold to customers in the United States and elsewhere.

**E.      Nippon Seiki Pleads Guilty to Price-Fixing Instrument Panel Clusters**

108.    Co-conspirator Nippon Seiki Co., Ltd. agreed to plead guilty to a single count criminal information and was sentenced to pay a $1 million criminal fine for participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Instrument Panel Clusters sold to an automobile manufacturer in the United States and elsewhere from at least as early as April 2008 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

109.     According to the Information filed, Nippon Seiki Co., Ltd. and its co-conspirators carried out the Instrument Panel Clusters conspiracy by:

(a)     participating in meetings, conversations, and communications in Japan to discuss the bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of Instrument Panel Clusters sold to an automobile manufacturer in the United States and elsewhere on a model-by-model basis;

(d)     submitting bids, price quotations, and price adjustments to an automobile manufacturer in the United States and elsewhere in accordance with the agreements reached;

(e)     selling Instrument Panel Clusters to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices;

(f)     accepting payment for Instrument Panel Clusters sold to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices;

(g)     engaging in meetings, conversations, and communications in Japan for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(h)     employing measures to keep their conduct secret, including but not limited to using code names.

**F.     The KFTC Fines DENSO and Continental for Price-Fixing Instrument Panel Clusters**

110.    On December 23, 2013, news sources reported that the KFTC fined DENSO

Corporation, and one of its Korean subsidiaries, and Continental Automotive Electronics for

conspiring to fix the prices of Instrument Panel Clusters sold between January 2008 and March

2012.  The panels were installed on 11 million Hyundai and Kia vehicles.  DENSO was fined $63

billion won (approximately $59 million USD) for its participation in the Instrument Panel  Cluster

conspiracy.[2]  Continental Automotive Electronics was fined $46 billion won  (approximately $42

million USD) for its participation in the Instrument Panel Cluster price-   fixing conspiracy.

**G.     Existence of A Cooperating Defendant**

111.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA")

provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses

its conduct to the Department of Justice.   In most recent cases in which guilty pleas for price-

fixing conduct have been obtained, there has been a cooperating party who has been accepted into

the DOJ's ACPERA program as an amnesty applicant.  One of the leniency benefits for a

conspirator which is accepted into the ACPERA program is that it is not charged with a criminal

offense and is not required to plead guilty to criminal charges.

112.    In addition to those Defendants who have pleaded guilty as alleged above,

Plaintiffs are aware that one or more entities have applied for amnesty pursuant to ACPERA and

that the same entities are currently cooperating with the DOJ.

**H.      Guilty Pleas in Related Markets in the Automotive Industry**

113.    On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. had

agreed to plead guilty and to pay a $200 million criminal fine for its role in a criminal price-

fixing and bid rigging conspiracy involving the sale of automotive wire harnesses and related

products to automobile manufacturers.

---

[2] The fine also encompassed DENSO's participation in a conspiracy with Bosch to price-fix windshield wipers.

114.    In the press release announcing the fine against Furukawa Electric Co. Ltd.,  Sharis A Pozen, then the Acting Assistant Attorney General in charge of the DOJ's Antitrust  division, said that "[a]s a result of this international price-fixing and bid-rigging conspiracy,  automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S.  consumers." Ms. Pozen also stated that "[t]his cartel harmed harmed an important industry in  our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will  continue to work together to ensure that these kinds of conspiracies are stopped."  The press  release also quoted FBI's Special Agent in Charge Andrew G. Arena, who said that "[w]hen  companies partner to control and price fix bids or contracts, it undermines the foundation of the  United States' economic system," and that "[t]he FBI is committed to aggressively pursuing any  company involved in antitrust crimes."

115.    On January 30, 2012, the DOJ announced that Defendant DENSO Corporation  agreed to plead guilty and was sentenced to pay a total of $78 million in criminal fines with  respect to a two-count criminal information charging DENSO Corporation with:  (1) participating  in a combination and conspiracy with its co-conspirators to suppress and eliminate  competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and  maintain the prices of electronic control units sold to an automobile manufacturer in the United  States and elsewhere from at least as early as January 2000 and continuing until at least February  2010 in violation of the Sherman Act, 15 U.S.C. § 1; (2) participating in a combination and  conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts  industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of heater control  panels sold to an automobile manufacturer in the United States and elsewhere from at least as  early as

January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

116.    Also on January 30, 2012, four executives from Yazaki Corporation (all Japanese nationals) – Tsuneaki Hanamura, Ryoji Kuwai, Shigeru Ogawa, and Hisamitsu Takada – agreed to plead guilty to their participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses sold to certain automobile manufacturers in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  These four executives of Yazaki Corporation will serve prison time ranging from 15 months to two years.  The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

117.    In the press release announcing the fines against Yazaki Corporation, its executives, and DENSO Corporation, Ms. Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ."  In the same press release, Special Agent in Charge Andrew G. Arena said that "[t]his criminal activity has as significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade.  The conduct has also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"

118.    Ms. Pozen said there is no doubt **consumers** were hurt financially by the automotive wire harness price-fixing conspiracy.  She stated:  "By rigging bids on wiring harnesses . . . the three companies inflated what some of their auto manufacturer clients paid, and indirectly, what consumers paid for some cars."

119.    On March 26, 2012, the DOJ announced that Norihiro Imai, an executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of heater control panels sold to customers in the United States and elsewhere.

120.    On April 3, 2012, the DOJ announced that G.S. Electech Inc. had agreed to plead guilty and to pay a $2.75 million criminal fine for its role in a conspiracy to fix the prices of speed sensor wire assemblies used on antilock brake systems installed in United States  automobiles.

121.    On April 23, 2012, the DOJ announced that Fujikura Ltd. had agreed to plead guilty and to pay a $220 million criminal fine for its role in a conspiracy to fix prices of automotive wire harnesses and related products installed in United States automobiles.

122.    On April 26, 2012, the DOJ announced that Makoto Hattori, an executive of Defendant DENSO Corporation, agreed to serve fourteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging  in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of heater control  panels sold to a customer in the United States and elsewhere.

123.    On June 6, 2012, the DOJ announced that Autoliv Inc. had agreed to plead guilty and to pay a $14.5 million criminal fine for its role in a conspiracy to fix prices of seatbelts, airbags and steering wheels installed in United States automobiles to automobile manufacturers.

124.    Also on June 6, 2012, the DOJ announced that Kazuhiko Kashimoto, an executive of Co-conspirator Yazaki Corporation, agreed to serve fourteen months in a U.S. prison, pay a $20,000 criminal fine and plead guilty to a one-count criminal Information charging him with

engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of automotive wire harnesses and related products sold to a customer in the United States and elsewhere.

125.    On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH had agreed to plead guilty and to pay a $5.1 million criminal fine for its involvement in a conspiracy to fix prices of seatbelts, airbags and steering wheels installed in automobiles sold in the United States.

126.    On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. had agreed to plead guilty and to pay a $17.7 million criminal fine for its role in a conspiracy to fix prices of heater control panels installed in automobiles sold in the United States and elsewhere.  Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

127.    On February 15, 2013, Scott Hammond, the deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomas Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. ***I say the biggest with respect to the <u>impact</u> on U.S. businesses and consumers, and the number of companies and executives that are subject to the investigation.***" (emphasis added).

128.    On May 21, 2013, the DOJ announced that Yuji Suzuki, an executive of Defendant DENSO Corporation, agreed to serve sixteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a two-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of electronic control units and heater control panels sold in the United States and elsewhere.

129.    On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. had agreed to plead guilty and to pay a $19 million criminal fine for its role in a conspiracy to fix prices of ignition coils installed in automobiles sold in the United States and elsewhere.

130.    In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said "[t]hose who engage in price fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

131.    On July 18, 2013, Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of various automotive parts including HID ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.

132.    On September 26, 2013, nine additional Japanese automotive suppliers agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than 30 different products:

(a)    Hitachi Automotive Systems Ltd. agreed to plead guilty and to pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of automotive parts including starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters and motor generators sold to automobile manufacturers in the United States and elsewhere;

(b)    Mitsuba Corporation agreed to plead guilty and to pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and

elsewhere.  Mitsuba also agreed to plead guilty to one count of obstruction of justice because of the company's efforts to destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the automotive parts industry;

(c)     Mitsubishi Electric Corporation agreed to plead guilty and to pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

(d)     Mitsubishi Heavy Industries Ltd. agreed to plead guilty and to pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of compressors and condensers sol to automobile manufacturers in the United States and elsewhere;

(e)     T.RAD Co. Ltd. agreed to plead guilty and to pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of radiators and automatic transmission fluid warmers (ATF warmers) sold to automobile manufacturers in the United States and elsewhere;

(f)     Valeo Japan Co. Ltd. agreed to plead guilty and to pay a $13.6 million criminal fine for its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the prices of air conditioning systems sold to automobile manufacturers in the United States and elsewhere;

(g)     JTEKT Corporation agreed to plead guilty and to pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered steering assemblies sold to automobile manufacturers in the United States and elsewhere;

30

(h)     NSK Ltd. agreed to plead guilty and to pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings sold to an automobile manufacturer in the United States and elsewhere; and

(i)     Yamashita Rubber Co. Ltd. agreed to plead guilty and to pay $11 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, raise and maintain the prices of automotive anti-vibration rubber products sold in the United States and elsewhere to automobile manufacturers.

133.   On the same day, September 26, 2013, United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's most recent findings in the ongoing automotive parts investigation.  He stated "[t]hese international price-fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers.  In total, more than 25  million cars purchased by American consumers were affected by the illegal conduct."  Holder  also described how the conspiracies worked:  "[c]ompany executives met face to face in the  United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix  prices and allocate the supply of auto parts sold to U.S. car companies.  In order to keep their  illegal conduct secret, they used code names and met in remote locations.  Then they followed up  with each other regularly to make sure the collusive agreements were being adhered to."  Attorney General Holder explained that the automotive parts conspiracies "targeted U.S.  manufacturing, U.S. businesses and U.S. consumers.  As a result of these conspiracies,  Americans paid more for their cars."

134.   The diagram below, which was prepared by the DOJ, illustrates the September 26, 2013 guilty pleas and the corresponding automotive parts to which the various manufacturers have admitted price-fixing.



135.   On October 9, 2013, Takata Corporation announced that it had agreed to pay $71.3 million to settle antitrust charges brought by United States federal prosecutors for its role in a conspiracy to price-fix seatbelts.

136.   On November 26, 2013, the DOJ announced that Toyo Tire & Rubber co. Ltd. had agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate

conspiracies to fix the prices of automotive components involving anti-vibration rubber and driveshaft parts installed in automobiles in the United States and elsewhere.

137.    On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. had agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a conspiracy to fix prices of automotive high-intensity discharge (HID) lamp ballasts installed in automobiles sold in the United States and elsewhere.

138.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co., Ltd. had agreed to plead guilty and to pay a $56.6 million criminal fine for its role in price-fixing conspiracies involving HID ballasts and automobile lighting fixtures installed in cars sold in the United States and elsewhere.

139.    On February 3, 2014, the DOJ announced that Aisan Industry Co. Ltd. had agreed to plead guilty and to pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to an automobile manufacturer in the United States and elsewhere.

140.    On February 13, 2014, the DOJ announced that Bridgestone Corp. had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.

141.    On February 20, 2014, the DOJ announced that Kazuaki Fujitani, a former executive of Defendant DENSO corporation, agreed to serve one year and one day in a U.S. prison and plead guilty to a one-count criminal Information charging him with obstruction of justice for deleting numerous e-mails and electronic documents upon learning the FBI was executing a search warrant on Defendant DENSO International America, Inc. in connection with

the DOJ's investigation into a conspiracy to fix the prices of heater control panels installed in automobiles sold in the United States and elsewhere.

142.    On April 23, 2014, the DOJ announced that Showa Corp. agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in cars sold in the United States and elsewhere.

143.    On August 19, 2014, the DOJ announced that NGK Sparkplug Co. Ltd. agreed to plead guilty and to pay a $52.1 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors installed in cars sold to automobile manufacturers in the United States and elsewhere

144.    To date, twenty-eight companies pleaded guilty or agreed to plead guilty and thirty-six executives have been charged in the Antitrust Division's ongoing investigation into price-fixing and bid-rigging in the automotive parts industry.  Each of the twenty-eight companies has agreed to plead guilty and altogether, they have agreed to pay approximately $2.4 billion in criminal fines.

**I.      Illustrative Examples of Defendants' Conspiratorial Conduct**

145.    Illustrative examples of Defendants' conspiratorial conduct in the market for Instrument Panel Clusters include, but are not limited to, the following:

**Toyota Tundra:  Model Year 2003 or 2004**

146.    In or about 2001, Toyota issued an RFQ for the Toyota Tundra, Model Year 2003 or 2004.  Yazaki had manufactured Instrument Panel Clusters for the previous model of the Tundra.  DENSO and Yazaki communicated with one another concerning the RFQ.  Because Yazaki had supplied Instrument Panel Clusters for the previous Toyota Tundra model, DENSO

agreed to respect Yazaki's "commercial rights", i.e., its existing claim to the business, and collusively coordinated its bids with Yazaki to ensure that Yazaki's bid was lower.

**Hyundai Santa Fe: Model Year Unknown**

147.   On March 3, 2003 Hyundai issued an RFQ for the Korean manufacture and contemplated U.S. manufacture of the Hyundai Santa Fe.  DENSO was the incumbent supplier of Instrument Panel Clusters to Hyundai for the Santa Fe.  During an initial telephone conversation with Continental's predecessor company, VDO,[3] DENSO indicated that it wanted to win the business and VDO agreed to respect DENSO's commercial rights by indicating that it would not aggressively pursue the contract.   DENSO won the business from Hyundai.

**Hyundai Equus (VI):  Model Year Unknown**

148.   In 2005, Hyundai issued an RFQ for the Hyundai Equus (VI).  DENSO was the incumbent supplier of Instrument Panel Clusters for the Hyundai Equus.  Continental reported to DENSO the prices for Instrument Panel Clusters it planned to submit to Hyundai in connection with the RFQ.  Continental agreed to bid higher for the contract to supply Instrument Panel Clusters for the Hyundai Equus (VI) in exchange for DENSO agreeing to bid higher for the contract to supply Instrument Panel Clusters for the Kia Borrego (Mohavi) (HM) (see below).

**Kia Borrego (Mohavi) (HM)**

149.   On May 15, 2005 Hyundai issued an RFQ for the Kia Borrego (Mohavi) (HM). Continental was the incumbent supplier of Instrument Panel Clusters for the Kia Borrego (Mohavi) (HM).  As stated above, Continental agreed to bid higher for the contract to supply Instrument Panel Clusters for the Hyundai Equus (VI) in exchange for DENSO agreeing to bid higher for the contract to supply Instrument Panel Clusters for the Kia Borrego (Mohavi) (HM).

---

[3] For the purposes of this Complaint, the terms "VDO" and "Continental" are used interchangeably.

As promised, DENSO bid higher for the contract to supply Instrument Panel Clusters for the Kia Borrego (Mohavi) (HM).

### Kia Forte/Cerato (TD):  Model Year Unknown

150.    On December 6, 2005, Hyundai issued an RFQ for the Kia Forte/Cerato (TD). DENSO was the incumbent supplier of Instrument Panel Clusters for the Kia Forte/Cerato. DENSO and Continental discussed the prices for Instrument Panel Clusters they planned to quote Hyundai in response to the RFQ over the telephone and Continental agreed to bid higher than DENSO.  Consequently, DENSO won the contract.

### Kia Sorrento, Hyundai Sonata (YF) and Hyundai Tucson (LM):  Model Years Unknown

151.    In February 2008, DENSO and Continental reached an agreement to generally respect each other's commercial rights going forward.  As a result of this agreement, they exchanged a document containing anticipated RFQs for 2008 and 2009.  The document indicates that the incumbent supplier for each RFQ would win, and it is signed by executives of Continental and DENSO.

### Toyota Camry:  Model Year Unknown

152.    In 2008, Denso had the commercial rights to supply Instrument Panel Clusters for the Toyota Camry.  Toyota invited DENSO and Nippon Seiki as well as Delphi and Continental to submit preliminary bids for the business.  Delphi submitted the lowest bid with Denso second. In the summer of 2008, Toyota issued a formal RFQ to Delphi as well as Yazaki and DENSO. DENSO and Yazaki held meetings in Japan to collusively coordinate their bid prices.  Several days before the companies' bids were submitted, DENSO and Yazaki exchanged bid price levels in yen and agreed that DENSO would submit a lower bid.  A DENSO employee then communicated with a Yazaki employee in the United States and the companies agreed to convert

and ultimately submit their bids in U.S. Dollars.  DENSO won the business for all of the U.S. Toyota Camry models.

**Toyota Avalon:  Launch Date 2011**

153.   Toyota issued an RFQ in late 2009 for the Toyota Avalon (launch date 2011) to DENSO, Yazaki, and Continental.  In connection with submitting bids for this RFQ, a DENSO employee located in Michigan communicated with a Yazaki employee located in Michigan via email and in-person.  Because DENSO had "commercial rights" to supply Instrument Panel Clusters for the Toyota Avalon, DENSO and Yazaki agreed that Yazaki would submit a higher bid than DENSO.  As agreed, Yazaki submitted a higher bid and DENSO was awarded the business.

**Honda Accord:  Model Year 2013**

154.   Honda issued an RFQ in 2009 to DENSO, Yazaki and Nippon Seiki.  At the time, Nippon Seiki had "commercial rights" to supply Instrument Panel Clusters for the Honda Accord. DENSO and Nippon Seiki communicated with one another concerning their respective pricing. In or about January 2010, Yazaki contacted DENSO to inquire as to whether DENSO wanted the business.  DENSO responded that it did not think it could win the business.  Nippon Seiki ultimately won the business.

**Honda S2000:  Model Year Unknown**

155.   In 2008, Honda submitted an RFQ to DENSO, Yazaki, and Nippon Seiki for Instrument Panel Clusters in connection with its Honda S2000.  DENSO communicated with Nippon Seiki and Yazaki via telephone to obtain the companies' pricing.  DENSO exchanged prices with Yazaki and agreed to bid higher than Yazaki for the business.  As agreed, DENSO submitted a higher bid and Yazaki was awarded the business.

**CLASS ACTION ALLEGATIONS**

156.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities who, during the Class Period, purchased or leased a new vehicle in the United States not for resale which included one or more Instrument Panel Cluster(s) as a component part, or indirectly purchased one or more Instrument Panel Cluster(s) as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant or any co-conspirators of the Defendants.

157.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment on behalf of the following class (the "Damages Class"):

> All persons and entities who, during the Class Period, purchased or leased a new vehicle in the Indirect Purchaser States[4] not for resale which included one or more Instrument Panel Cluster(s) as a component part, or indirectly purchased one or more Instrument Panel Cluster(s) as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant or any co-conspirator of the Defendants.

158.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."  Excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Instrument Panel Clusters  directly or for resale.

159.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

---

[4] The Indirect Purchaser States are the states listed in the Second and Third Claims for Relief.

160.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' and their co-conspirators' conspiracy, which was generally applicable to all members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Instrument Panel Clusters sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)    Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

(f)    Whether Defendants unjustly enriched themselves to the detriment of Plaintiffs and members of the Classes, thereby entitling Plaintiffs and members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of Instrument Panel Clusters sold in the United States during the Class Period;

(i)     Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discovery the conspiracy;

(j)     Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and members of the Classes;

(k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l)     The appropriate class-wide measure of damages for the Damages Class.

161.    Plaintiffs' claims are typical of the claims of members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Instrument Panel Clusters purchased indirectly from Defendants and/or their co-conspirators.

162.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

163.    The questions of law and fact common to members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

164.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

165.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

166.    The Defendants' price-fixing conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to Instrument Panel Clusters;

(b)    The prices of Instrument Panel Clusters have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Indirect purchasers of Instrument Panel Clusters have been deprived of free and open competition; and

(d)    Indirect purchasers of Instrument Panel Clusters paid artificially inflated prices.

167.    During the Class Period, Plaintiffs and members of the Classes paid supra-competitive prices for Instrument Panel Clusters.  These inflated prices have been passed on to them by OEMs and dealers.  Those overcharges have unjustly enriched Defendants.

168.    The markets for Instrument Panel Clusters and vehicles are inextricably linked and intertwined because the market for Instrument Panel Clusters exists to serve the vehicle market.

Without the vehicles, Instrument Panel Clusters have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for Instrument Panel Clusters.  As stated in the 2010 Annual report of Lear Corporation, an automobile parts supplier: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer fleet demand for automotive vehicles."

169.    Instrument Panel Clusters are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Instrument Panel Clusters follow a traceable physical chain of distribution from Defendants to Plaintiffs and members of the Classes, and any costs attributable to Instrument Panel Clusters can be traced through the chain of distribution to Plaintiffs and members of the Classes.

170.    Just as Instrument Panel Clusters can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Instrument Panel Clusters affect prices paid by indirect purchasers of new motor vehicles containing Instrument Panel Clusters.

171.    While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of competition a firm faces.  The OEM and dealer markets for new motor vehicles are subject to vigorous price competition.  The OEMs and dealers have thin net margins, and are therefore at the mercy of their component costs, such that increases in the price of components such as Instrument Panel Clusters lead to corresponding increases in prices for new motor vehicles and replacement parts at the OEM and dealer levels.  When downstream distribution markets are highly competitive, as they are in the case of new motor vehicles containing Instrument Panel Clusters as

components, overcharges are passed through to ultimate consumers, such as the indirect-purchaser Plaintiffs and members of the Classes.

172.    Hence the inflated prices of Instrument Panel Clusters both in new motor vehicles and those purchased for repair resulting from the Defendants' and their co-conspirators' bid rigging and price-fixing conspiracy have been passed on to Plaintiffs and other members of the Classes by OEMs and dealers.

173.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[5]

174.    As Professor Jeffrey K. MacKien-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers.… Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as

---

[5] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

well.[6]

175.     The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of Instrument Panel Clusters and, as a direct and foreseeable result, the price of new motor vehicles containing Instrument Panel Clusters and the price of Instrument Panel Clusters purchased for repair purposes.  Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of Instrument Panel Clusters on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time.  A regression model can explain how variation in the price of Instrument Panel Clusters affects changes in the price of new motor vehicles.  In such models, the price of Instrument Panel Clusters would be treated as an independent or explanatory variable.  The model can isolate how changes in the price of Instrument Panel Clusters impact the price of new motor vehicles containing Instrument Panel Clusters while controlling for the impact of other price-determining factors.

176.     The precise amount of the overcharge impacting the prices of new motor vehicles containing Instrument Panel Clusters can be measured and quantified.  Commonly used and  well-accepted economic models can be used to measure both the extent and the amount of the  supra-

---

[6] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*,  No. J.C.C.P. No. 4106, (Cal. Sup. Ct. Aug. 29, 2000).

competitive charge passed through the chain of distribution.  Thus, the economic harm to Plaintiffs and the members of the Classes can be quantified.

177.    In addition to the regression analysis discussed above demonstrating impact on consumers, the DOJ's Antitrust Division, which has been investigating anticompetitive conduct in the automotive parts industry for some time, **has concluded that there is "no doubt" that consumers were hurt financially**.  Sharis A. Pozen, then Acting Assistant Attorney General in charge of the DOJ's Antitrust Division said there is no doubt **consumers** were hurt financially by the automotive wire harness price-fixing conspiracy.  "By rigging bids . . . [automotive parts manufacturers engaged in a price-fixing conspiracy] inflated what some of their auto manufacturing clients paid, and indirectly, what consumers paid for some cars," Ms. Pozen said. She also explained that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers."  Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."  In a separate press statement, Ms. Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ."

178.    On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomas Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered.  ***I say the biggest with respect to the <u>impact</u>***

***on U.S. businesses and consumers, and the number of companies and executives that are***

***subject to the investigation.***"  (emphasis added).

179.    On September 26, 2013, United States Attorney General Eric Holder in the

Antitrust Division presented the DOJ's then most recent findings in the ongoing automotive parts

investigation.  He stated "[t]hese international price-fixing conspiracies affected more than $5

billion in automobile parts sold to U.S. car manufacturers.  In total, more than 24 million cars

purchased by American consumers were affected by the illegal conduct."  Holder also described

how the conspiracies worked:  "[c]company executives met face to face in the United states and

Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and  allocate

the supply of auto parts sold to U.S. car companies.  In order to keep their illegal conduct secret,

they used code names and met in remote locations.  Then they followed up with each other

regularly to make sure the collusive agreements were being adhered to."  Attorney  General

Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S.

businesses and U.S. consumers.  As a result of these conspiracies, Americans paid more for  their

cars."

180.    On May 25, 2014, news sources reported that Brent Snyder, a deputy assistant

attorney general in the Antitrust Division, said with respect to the automotive parts conspiracies,

"[i]t's a very, very safe assumption that U.S. consumers paid more, and sometimes significantly

more, for their automobiles as a result of this conspiracy."

181.    By reason of the violations of the antitrust laws alleged herein, Plaintiffs and

members of the Classes have sustained injury to their businesses or property, having paid higher

prices for Instrument Panel Clusters than they would have paid in the absence of Defendants'  and

their co-conspirators' illegal contract, combination, or conspiracy, and, as a result, have  suffered

damages in an amount presently undetermined.  This is an antitrust injury of the type  that the antitrust laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

**A.** **The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims**

182.    Plaintiffs repeat and re-allege the allegations set forth above.

183.    Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) January 30, 2012, the date that the DOJ announced Yazaki's anticipated guilty plea for its role in the criminal price-fixing conspiracy alleged herein.[7]

184.    Plaintiffs and the members of the Classes purchased or leased vehicles or purchased Instrument Panel Clusters to replace or repair damaged or defective Instrument Panel Clusters in their vehicles.  They had no direct contact or interaction with the Defendants in this case and had no means from which they could have discovered the combination or conspiracy described in this Complaint before January 30, 2012, the date that the DOJ announced Yazaki's anticipated guilty plea for its role in the criminal price-fixing conspiracy alleged herein.

185.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to January 30, 2012, the date that the DOJ announced Yazaki's anticipated guilty plea for its role in the criminal price-fixing conspiracy alleged herein, that

---

[7] With respect to Defendant Continental, Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set  forth herein until (at the earliest), December 23, 2013, the date that news sources reported that that the KFTC fined DENSO Corporation, and one of its Korean subsidiaries, and Continental Automotive Electronics for conspiring to fix the prices of Instrument Panel Clusters.  No information in the public domain was available to the Plaintiffs and the members of the Classes prior to December 23, 2013 that revealed sufficient information to suggest that Continental was involved in a conspiracy to price-fix Instrument Panel Clusters.  Therefore, with respect to Defendant Continental, the statute of limitations did not begin to run because Plaintiffs and the members of the Classes did not and could not discover their claims, or in the alternative, because fraudulent concealment tolled the statute of limitations, until December 23, 2013.

revealed sufficient information to suggest that the Defendants were involved in a criminal conspiracy to price-fix and rig bids for Instrument Panel Clusters.  Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of the Defendants' dealing with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

186.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

**B.      Fraudulent Concealment Tolled the Statute of Limitations**

187.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until January 30, 2012, the date that the DOJ announced Yazaki's anticipated guilty plea for its role in the criminal price-fixing conspiracy alleged herein.[8]

188.    Before that time, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct, and did not know before then that they were paying supra-competitive prices for Instrument Panel Clusters throughout the United States during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and members of the Classes that even hinted to Plaintiffs that they were being injured by Defendants' unlawful conduct.

189.    The affirmative acts of Defendants' alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

---

[8] *See* Footnote 6.

For instance, Defendants intentionally marked for destruction documents that implicated their conspiratorial conduct.  Defendants also created code names to conceal their illegal activities. Yazaki was commonly referred to as "y" or "yz."  Nippon Seiki was often referred to as "ns." Desno was commonly referred to as "d" or "dn."

190.    As stated in the Information filed against Co-conspirator Nippon Seiki Co., Ltd., the Defendants and their co-conspirators employed "measures to keep their conduct secret, including but not limited to using code names."

191.    Additionally, as stated in the Information filed against Co-conspirator Yazaki Corporation, the Defendants and their co-conspirators also met "at private residences or remote locations" to keep their unlawful conduct secret.

192.    By its very nature, Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing.  Instrument Panel Clusters are not exempt from antitrust regulation and, thus, Plaintiffs and members of the Classes reasonably considered the Instrument Panel Clusters industry to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Instrument Panel Clusters prices before January 30, 2012, the date that the DOJ announced Yazaki's anticipated guilty plea for its role in the criminal price-fixing conspiracy alleged herein.

193.    Plaintiffs and members of the Classes could not have discovered the alleged contract, combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

194.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until January 30, 2012,  the date that the DOJ announced Yazaki's anticipated guilty plea for its role in the criminal price-fixing conspiracy alleged herein.

195.     For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims with respect to the Instrument Panel Clusters conspiracy was tolled and did not begin to run until January 30, 2012.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

196.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

197.     Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

198.     The acts done by each Defendant as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

199.     During the Class Period, Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices, rig bids, and allocate markets for Instrument Panel Clusters, thereby creating anticompetitive effects.

200.    The anticompetitive acts were intentionally directed at the United States market  for Instrument Panel Clusters and had a substantial and foreseeable effect on interstate commerce  by raising and fixing prices for Instrument Panel Clusters throughout the United States.

201.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Instrument Panel Clusters.

202.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly  situated indirect purchasers in the Nationwide Class who purchased Instrument Panel Clusters  have been harmed by being forced to pay inflated, supra-competitive prices for Instrument Panel  Clusters.

203.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

204.    Defendants' and their co-conspirators' conspiracy had the following effects, among others:

(a)    Price competition in the market for Instrument Panel Clusters has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Instrument Panel Clusters sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased Instrument Panel Clusters indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

205.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Instrument Panel Clusters purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

206.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

207.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

208.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

209.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Instrument Panel Clusters in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

210.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Instrument Panel Clusters and to allocate customers for Instrument Panel Clusters in the United States.

211.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Instrument Panel Clusters at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid

by Plaintiffs and members of the Damages Class with respect to Instrument Panel Clusters sold in the United States;

(b)      allocating customers and markets for Instrument Panel Clusters in the United States in furtherance of their agreements; and

(c)      participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

212.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize  prices and to allocate customers with respect to Instrument Panel Clusters.

213.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

214.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

215.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Instrument Panel Clusters at supracompetitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Instrument Panel Clusters.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above

and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Instrument Panel

Clusters; and (2) Allocating among themselves the production of Instrument Panel Clusters.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the

following effects:  (1) Price competition in the sale of Instrument Panel Clusters has been

restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Instrument

Panel Clusters sold by Defendants and their co-conspirators have been fixed, raised, stabilized,

and pegged at artificially high, non-competitive levels in the State of California and throughout

the United States; and (3) Those who purchased Instrument Panel Clusters directly or indirectly

from Defendants and their co-conspirators have been deprived of the benefit of free and open

competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property in

that they paid more for Instrument Panel Clusters than they otherwise would have paid in the

absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720

of the California Business and Professions Code, Plaintiffs and members of the Damages Class

seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to

Section 16750(a) of the California Business and Professions Code.

216.   Defendants have entered into an unlawful agreement in restraint of trade in

violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had

the following effects:  (1) Instrument Panel Clusters price competition was restrained,

suppressed, and eliminated throughout the District of Columbia; (2) Instrument Panel Clusters

prices were raised, fixed, maintained and stabilized at artificially high levels throughout the

District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and

open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive,

artificially inflated prices for Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct substantially affected

District of Columbia commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available

under District of Columbia Code Ann. §§ 28-4501, *et seq.*

217.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Iowa Code §§ 553.1, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had

the following effects:  (1) Instrument Panel Clusters price competition was restrained,

suppressed, and eliminated throughout Iowa; (2) Instrument Panel Clusters prices were raised,

fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for

Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct substantially affected

Iowa commerce.

56

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

218.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiffs and

members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

219.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Maine; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

220.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

      (a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

      (b)     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

      (c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      (d)     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

221.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

      (a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

222.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

223.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

224.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§  598A, *et seq.*

225.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

226.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

227.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout New York; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters when they purchased vehicles containing Instrument Panel Clusters, or purchased products that were otherwise of lower quality, than would have been absent Defendants' and their co-conspirators' illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.*  The conduct set forth above is a *per se* violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

228.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

229.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

230.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

231.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Instrument Panel Clusters prices were

raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

232.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

233.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Utah; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

69

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

234.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

235.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

236.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Instrument Panel Clusters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3)

Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

237.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' and their co-conspirators' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid more for Instrument Panel Clusters than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

238.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of members of the Plaintiffs and the members of the Damages Class.

239.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or

otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit,

including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

240.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

241.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

fraudulent acts or practices in violation of the state consumer protection and unfair competition

statutes listed below.

242.    Defendants have knowingly entered into an unlawful agreement in restraint of

trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

(a)    The Defendants knowingly agreed to, and did in fact, act in restraint of

trade or commerce  by affecting, fixing, controlling, and/or maintaining at non-competitive and

artificially inflated levels, the prices at which Instrument Panel Clusters were sold, distributed, or

obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members

of the Damages Class.

(b)    The aforementioned conduct on the part of the Defendants constituted

"unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, §

4-88-107(a)(10).

(c)    Defendants' unlawful conduct had the following effects:  (1) Instrument

Panel Clusters price competition was restrained, suppressed, and eliminated throughout

Arkansas; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages

Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(d)     During the Class Period, the Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

243.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants marketed, sold, or distributed Instrument Panel Clusters in California, and Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from the Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(c)     The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged

74

herein, constituted a common, continuous, and continuing course of conduct of unfair

competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the

meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not

limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above;

(2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set

forth above;

(d)     Defendants' acts, omissions, misrepresentations, practices, an non-

disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the

California Business and Professions Code, and whether or not concerted or independent acts, are

otherwise unfair, unconscionable, unlawful or fraudulent;

(e)     Defendants' acts or practices are unfair to consumers of  Instrument Panel

Clusters (or vehicles containing them) in the State of California within the meaning of Section

17200, California Business and Professions Code; and

(f)     Defendants' acts and practices are fraudulent or deceptive within the

meaning of Section 17200 of the California Business and Professions Code.

(g)     Plaintiffs and members of the Damages Class are entitled to full restitution

and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have

been obtained by defendants as a result of such business acts or practices.

(h)     The illegal conduct alleged herein is continuing and there is no indication

that defendants will not continue such activity into the future.

(i)     The unlawful and unfair business practices of Defendants, and each of

them, as described above, have caused and continue to cause Plaintiffs and the members of the

Damages Class to pay supracompetitive and artificially-inflated prices for Instrument Panel

Clusters (or vehicles containing them).  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(j)      The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

(k)      As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

244.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)      Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Instrument Panel Clusters were sold, distributed or obtained in the District of Columbia.

(b)      The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.  Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Instrument Panel Clusters.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any

meaningful choice in purchasing Instrument Panel Clusters because they were unaware of the

unlawful overcharge and there was no alternative source of supply through which Plaintiffs could

avoid the overcharges.  Defendants' conduct with regard to sales of Instrument Panel Clusters,

including their illegal conspiracy to secretly fix the price of Instrument Panel Clusters  at

supracompetitive levels and overcharge consumers, was substantively unconscionable because  it

was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

Defendants took grossly unfair advantage of Plaintiffs.  The suppression of competition that has

resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for

consumers so that there was a gross disparity between the price paid and the value received for

Instrument Panel Clusters.

         (c)    Defendants' unlawful conduct had the following effects:  (1) Instrument

Panel Clusters price competition was restrained, suppressed, and eliminated throughout the

District of Columbia; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and

stabilized at artificially high levels  throughout the District of Columbia; (3) Plaintiffs and the

Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages

Class paid supra-competitive, artificially inflated prices for Instrument Panel Clusters.

         (d)    As a direct and proximate result of the Defendants' conduct, Plaintiffs and

members of the Damages Class have been injured and are threatened with further injury.

Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and

members of the Damages Class seek all relief available under that statute.

245.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)    Defendants' unlawful conduct had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Florida; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

246.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

(a)    Defendants' unlawful conduct had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and stabilized at artificially  high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class

were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid  supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)      During the Class Period, Defendants' illegal conduct substantially affected

Hawaii commerce and consumers.

(c)      As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured and are threatened with further

injury.

(d)      Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and

members of the Damages Class seek all relief available under that statute.

247.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

(a)      Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

(b)      Defendants agreed to, and did in fact, act in restraint of trade or commerce

in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at

artificial and non-competitive levels, the prices at which Instrument Panel Clusters were sold,

distributed, or obtained in Massachusetts and took efforts to conceal their agreements from

Plaintiffs and members of the Damages Class.

(c)      Defendants' unlawful conduct had the following effects:  (1) Instrument

Panel Clusters price competition was restrained, suppressed, and eliminated throughout

Massachusetts; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and stabilized

at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the  Damages

79

Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Instrument Panel Clusters.

(d)    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

(e)    Certain of the Defendants have or will be mailed or delivered a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such receipt of a demand letter was unnecessary due to the Defendants not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

(f)    By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2.  Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

248.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

(a)    Missouri Plaintiff and members of this Damages Class purchased Instrument Panel Clusters for personal, family, or household purposes.

(b)    Defendants engaged in the conduct described herein in connection with the sale of Instrument Panel Clusters in trade or commerce in a market that includes Missouri.

(c)    Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Instrument Panel Clusters were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was

unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

(d)     Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Instrument Panel Clusters. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Instrument Panel Clusters they purchased.

(e)     Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Instrument Panel Clusters by making public statements that were not in accord with the facts.

(f)     Defendants' statements and conduct concerning the price of Instrument Panel Clusters were deceptive as they had the tendency or capacity to mislead Plaintiffs and the members of the Damages Class to believe that they were purchasing Instrument Panel Clusters at prices established by a free and fair market.

(g)     Defendants' unlawful conduct had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Instrument Panel Clusters.

(h)     The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(i)      As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

(j)      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

249.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq.*

(a)      Defendants' unlawful conduct had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Montana; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Instrument Panel Clusters.

(b)      During the Class Period, Defendants marketed, sold, or distributed Instrument Panel Clusters in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

250.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Instrument Panel Clusters were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Instrument Panel Clusters as set forth in N.M.S.A., § 57-12-2E.  Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Instrument Panel Clusters.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful

choice in purchasing Instrument Panel clusters because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.  Defendants' conduct with regard to sales of Instrument Panel Clusters, including their illegal conspiracy to secretly fix the price of Instrument Panel Clusters at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs.  The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Instrument Panel Clusters.

(c)     Defendants' unlawful conduct had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Instrument Panel Clusters.

(d)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

251.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Instrument Panel Clusters were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants and their-co-conspirators made public statements about the prices of Instrument Panel Clusters and products containing Instrument Panel Clusters that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Instrument Panel Clusters and products containing Instrument Panel Clusters; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

(c)     Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased Instrument Panel Clusters were misled to believe that they were paying a fair price for Instrument Panel Clusters or the price increases for Instrument Panel Clusters were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

(d)     Defendants knew that their unlawful trade practices with respect to pricing Instrument Panel Clusters would have an impact on New York consumers and not just the Defendants' direct customers.

(e)     Defendants knew that their unlawful trade practices with respect to pricing Instrument Panel Clusters would have a broad impact, causing consumer class members who indirectly purchased Instrument Panel Clusters to be injured by paying more for Instrument Panel Clusters than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(f)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(g)     Defendants' unlawful conduct had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout New York; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Instrument Panel Clusters.

(h)     During the Class Period, Defendants marketed, sold, or distributed Instrument Panel Clusters in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

(i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Instrument Panel Clusters in New York.

(j)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

252.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

(a)     Defendants and their co-conspirators agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Instrument Panel Clusters were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants' public statements concerning the price of Instrument Panel Clusters created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the  conspiracy to outsiders, conducting meetings and conversations

in secret, confining the plan to a small group of higher level officials at each company and avoiding the creation of documents which would reveal the antitrust violations.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Defendants' unlawful conduct had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Instrument Panel Clusters.

(e)     During the Class Period, Defendants marketed, sold or distributed Instrument Panel Clusters in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(f)     During the Class Period, the Defendants directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Instrument Panel Clusters in North Carolina.

(g)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs

and members of the Damages Class seek all relief available under that statute.

253. Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer

Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

(a) Plaintiffs and members of this Damages Class purchased Instrument Panel

Clusters for personal, family, or household purposes.

(b) Defendants and their co-conspirators agreed to, and did in fact, act in

restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing,

controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which

Instrument Panel Clusters were sold, distributed, or obtained in Rhode Island.

(c) Defendants deliberately failed to disclose material facts to Plaintiffs and

members of the Damages Class concerning their unlawful activities and artificially inflated

prices for Instrument Panel Clusters. Defendants owed a duty to disclose such facts, and

considering the relative lack of sophistication of the average, non-business consumer,

Defendants breached that duty by their silence. Defendants misrepresented to all consumers

during the Class Period that their Instrument Panel Clusters prices were competitive and fair.

(d) Defendants' unlawful conduct had the following effects: (1) Instrument

Panel Clusters price competition was restrained, suppressed, and eliminated throughout Rhode

Island; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages

Class were deprived of free and open competition; and (4) Plaintiffs and members of the

Damages Class paid supra-competitive, artificially inflated prices for Instrument Panel Clusters.

(e)    As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(f)    Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Instrument Panel Clusters, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Instrument Panel Clusters at prices born by a free and fair market.  Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Instrument Panel Clusters they purchased.

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws.  § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

254.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Instrument Panel Clusters were sold, distributed, or obtained in Vermont.

(b)    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Instrument Panel Clusters.  Defendants owed a duty to disclose such facts, and

considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence.  Defendants misrepresented to all consumers during the Class Period that their Instrument Panel Clusters prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects:  (1) Instrument Panel Clusters price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Instrument Panel Clusters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Instrument Panel Clusters.

(d)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Instrument Panel Clusters, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Instrument Panel Clusters at prices born by a free and fair market.  Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

255.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

256.    Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*, except for the state of California.  Plaintiffs also bring this claim under the laws of South Carolina.

257.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Instrument Panel Clusters.

258.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Instrument Panel Clusters.

259.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

260.    Pursuit of any remedies against the firms from whom Plaintiffs and the members of the Damages Class purchased vehicles containing Instrument Panel Clusters and Instrument Panel Clusters subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

1.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

2.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be  adjudged and decreed:

(a)      An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)      A *per se* violation of Section 1 of the Sherman Act;

(c)      An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)      Acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.       Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.


DATED: March 31, 2017                    _/s/ Omar Ochoa_
                                         Steven N. Williams
                                         Elizabeth Tran
                                         Demetrius X. Lambrinos
                                         **COTCHETT, PITRE & McCARTHY, LLP**
                                         San Francisco Airport Office Center
                                         840 Malcolm Road, Suite 200
                                         Burlingame, CA 94010
                                         Telephone: (650) 697-6000
                                         Facsimile: (650) 697-0577
                                         swilliams@cpmlegal.com
                                         etran@cpmlegal.com
                                         dlambrinos@cpmlegal.com

                                         Hollis Salzman
                                         Bernard Persky
                                         William V. Reiss
                                         **ROBINS KAPLAN LLP**
                                         601 Lexington Avenue, Suite 3400
                                         New York, NY 10022
                                         Telephone: (212) 980-7400
                                         Facsimile: (212) 980-7499
                                         HSalzman@RobinsKaplan.com
                                         BPersky@RobinsKaplan.com
                                         WReiss@RobinsKaplan.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Chanler Langham
Omar Ochoa
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
toxford@susmangodfrey.com
clangham@susmangodfrey.com
oochoa@susmangodfrey.com

*Interim Co-Lead Class Counsel for the Proposed End-Payor Plaintiff Class*

E. Powell Miller
Devon P. Allard
**THE MILLER LAW FIRM, P.C.**
The Miller Law Firm, P.C.
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
epm@millerlawpc.com
dpa@millerlawpc.com

*Interim Liaison Counsel for the Proposed End-Payor Plaintiff Classes*

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

DATED: March 31, 2017

*/s/ Omar Ochoa*
Steven N. Williams
Elizabeth Tran
Demetrius X. Lambrinos
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
swilliams@cpmlegal.com
etran@cpmlegal.com
dlambrinos@cpmlegal.com

Hollis Salzman
Bernard Persky
William V. Reiss
**ROBINS KAPLAN LLP**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
HSalzman@RobinsKaplan.com
BPersky@RobinsKaplan.com
WReiss@RobinsKaplan.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Chanler Langham
Omar Ochoa
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
toxford@susmangodfrey.com
clangham@susmangodfrey.com
oochoa@susmangodfrey.com

*Interim Co-Lead Class Counsel for the Proposed End-Payor Plaintiff Class*

E. Powell Miller
Devon P. Allard
**THE MILLER LAW FIRM, P.C.**
The Miller Law Firm, P.C.
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
epm@millerlawpc.com
dpa@millerlawpc.com

*Interim Liaison Counsel for the Proposed End-Payor Plaintiff Classes*